I'd like to thank you for inviting us here for the oral argument and giving us an opportunity to have an injustice corrected. The primary subject matter of our case is fraud. And this fraud, we discovered very late in the spring of 2008, occurred during a temperature waiting period. And what had happened is our immediate president of our division and the executive defendants had him tell us about a severance policy that would include our commission income. We trusted these people. We worked with them for years. And after the fact, after we got terminated after the merger, we were offered less than four cents on the dollar on what had been offered to us. And we did our jobs. We met our sales numbers and everything. And the four individual defendants that are named in this suit, they walked out of this merger with over $100 million between them for successfully selling the company. Another point is this case was removed to federal court on the basis of ERISA and yet the underlying documents themselves are not ERISA. And the most on-point case for this actually comes out of this very same courthouse. And I even saw the person who wrote the opinion on the front door when I walked in. And it's Winterowd versus American General Insurance. And if you look at American General, apparently, or if you look at our case, the defendants delegated the amendment authority to an HRVP. And Winterowd said ERISA amendments are serious events that require board approval. They shouldn't be a cavalier type event. CAA also granted themselves the right to amend retroactively, and they tried to exercise this right. And once again, you go back to Winterowd, and Winterowd said that an amendment, an ERISA amendment that denies benefits cannot be applied retroactively. Another on-point case is Leda versus Allied Signal. And Leda, here's an example of a case where the defendants didn't take adequate precaution to assure that the individuals received the summary plan document. And because they didn't receive the summary plan document, everything rolled back to what the original offer would be. We never received anything in writing until about 30 days after we were terminated. So no summary plan documents were ever provided to us. And then another thing I'd like to call your attention to is you're going to see that there's two different versions of the amendment policy. If you look at the excerpt of record page 270, or excuse me, page 270 through 277, the top title reads, Amendment to Sterling Software, Inc. Special Severance Benefits Policy. This is the only, and please note that that document is unsigned and undated. And that's the only document that we received during the 45-day acceptance period. And naturally, you know, when you receive an unsigned, undated document that pays you less than four cents on the dollar, you're going to look at it and you're going to go, you know, I want to see a document that's valid, you know, it's signed, it's valid. It says here it's an amendment, I have a right to see the underlying document. Because who knows, maybe the underlying document had special language in there that said none of these amendments would apply for Brad and Ralph here. The, I think you probably understand that one of your big problems is the prior lawsuit. Yeah, yeah. That the question is whether it is so close to this one, the same controversy that you're bound by the decision on it. Well, if you look at the way this lawsuit came to be and the way the prior one happened, we learned of this fraud very late. It was too late for us to amend it to the prior case. And it was a case where, you know, this is information that shouldn't have been withheld from us. It should have been given to us. So what we did is we immediately had a second suit filed because we had a fraud statute that we were running up against that we were concerned about. You had a unique set of individuals and the claims in it are state claims where the claims in the first case ended up being a diversity in the federal court. And here's a key point. Our counsel at the time notified the opposing counsel twice about the suit. And he actually claimed he never knew about it, and yet we presented a letter that showed, yes, indeed, he did know about it. And if you look, our opposing counsel made a second attempt to notify the opposing counsel about the second suit. And she also attempted to effect settlement. So here you have a situation where we have an active set of claims in case number one, which is under a state of appeal, and we have an active set of new fraud-related claims. And out of that set of discussions, we ended up with voluntary dismissal of the first set of claims. You know, if you look at the difference between fraud and what we were going after in the first suit, fraud is a much bigger issue and the potential damages are much higher, and we have limited resources. So we determined that it was in our best interest to, you know, worry about the big picture and avoid the little picture. So when we went into that voluntary dismissal, both parties consented to a splitting of claims, which would make the first case not preclusive to the current case. I'd like to reserve time for... I didn't have you identify yourself for the record. Oh, I'm sorry. I'm Rex Bradley-Wesley. So Mr. Johnson, you must be. Okay. I, too, would like to also thank you for allowing us to speak and to hear our case. Certainly. It really is the first time that I felt that we've gotten the opportunity to have our day in court, if you would. And the basis for that is we had attorneys speaking for us, but somehow the message did not get translated as to what really occurred, because I can't see how the conclusions would have been drawn, the process and the procedural issues that had affected us so adversely would have happened, which resulted in us being here had those facts been truly understood. So basically I'm incorporating everything that Brad said into my comments, as well as the briefs and everything that's been said in terms of what was stated in the supplements and so forth. And also what we were able to uncover when we went around in the Bach case. Well, those things told us that we were not alone in terms of the type of process that was proceeded against us, in terms of CA's approach to sterling software employees, particularly sales people, who would have, based on the fact that 80% of our income was a function of commissions, if we had been told at the critical timing point when the merger was announced, as we were told about the severance plan. So again, I'm sorry, in terms of the severance plan, we were told that it was available to us when the merger was announced, on or about that same time. We were also told that commissions were included. However, what we found is that both sterling software and Computer Associated already agreed to modify those severance plans, and modify the executive severance plans as well, prior to the merger being, as a condition of the merger, as a matter of fact. And so we were told that they included commissions. We were told that the sterling agreement, the sterling severance plan, was designed to protect us, the employees, in the event of a termination, an unlikely termination, even though we were promised that we would remain employed. But what was actually presented to us in the mail, once we were terminated, was not a sterling severance plan, even though it's called an amendment to. It was really a CA document. It was not what they promised us. It was not a sterling plan. It was not consummated or executed by a sterling employee. It was signed by Deborah Kaufman, who was an HR employee of Computer Associates. And that's another point that I wanted to highlight. The bylaws of sterling software required only those who had designated authority to be able to sign and implement such a program as a severance plan. And it was signed and executed by Sterling Williams, the CEO and President of Sterling Software. When the executives amended their severance plans at the onset of the merger agreement, that was signed and executed by the general counsels of both companies, CA and Computer and Sterling Software, and the executive in question. However, when they presented the amendment to us, which was unsigned, as Brad indicated, which was subsequently found was signed by Deborah Kaufman, a CA employee, it never referenced her designated or delegated authority. And so we questioned that. We questioned whether that is a legitimate document, because no authority was ever provided to us when we asked during the 45-day period in which we had the ability to make and accept that offer. We were told either sign it and provide that waiver and release agreement or lose the rights of that offer. So we were faced with that dilemma of, well, is this legitimate? We're looking for a valid agreement. We're looking to understand what our rights are, and how can we do that if you don't give us all the tools that we need? This flies in the face of ERISA and all the claims that they've made, according to ERISA being applicable here. And also we feel that the ERISA argument was really used as an opportunity to evade or preempt oral promises that were made to us by the president or a division, fraudulent activity relative to them leading us to believe that we would be given severance at the level that they described, but then offering us a very small fraction of that, as Brad pointed out. Do you want to add anything to your colleagues' comments about the preclusive effect? That's the technical hurdle that we have to consider, is whether or not the disposition of the prior suit precludes hearing your claims in this case. I can only say personally that when our attorney approached CA and asked them if they wanted to settle after the motion of summary judgment was granted, because we were bringing a new counsel and because we did have a legitimate fraud claim that we were going to pursue, we offered to settle at $1.6 million, and they declined. We then came back and said, okay, we're going to pursue the second case in state court, fraud claim and severance claims, and would you be interested in dropping the appeal apart from? And that's where the separation, that's where the splitting of the claims occurred. And I'm only adding to it from that standpoint in terms of our intent, our direction to our counsel, and what we understood was actually consummated at the time. Now, the documents were drafted by CA, and so I can't speak to that, but I do know our intent, I do know what we agreed to. Your argument is that what you agreed to, it doesn't buy the state suit. I'm sorry? Your argument is that what you agreed to does not buy your second suit. Am I stating your position correctly? That what you agreed to in settlement, in their agreement not to... That was voluntarily dismissed. Yes. And the part of that agreement was that your second suit could proceed. Yes. As a split and as a separate transaction of nucleus of facts that were developed apart from the first case. The first case, we literally thought CA had decided not to honor the arrangements that Sterling Saundra had put in place. And we had no, absolutely no way of knowing that that was not the case, not until we received documentation during the discovery period that showed that actually Sterling Saundra was actively and adamantly involved in that process, in which case we started the process from that point on. So it's two separate transactional nucleus of facts that created our second case. And it was our understanding that we had the right to pursue them at the state level because we had individual defendants that we had identified who were actively involved in that process. Okay, thank you. Why don't we put 15 minutes on just for fairness? Good morning, Your Honor. It's Dennis Childs for the Appellee's Defendant's Club, Computer Associates et al. I think what I'd like to do with the Court's indulgence is briefly describe the volume of litigation that was conducted. We did include in the excerpts of record the civil docket sheet, and in our brief as well we tried to give the Court the flavor for the number of issues that were presented to the District Court in connection with the first suit. I think the best way I can describe it is to point out three or four, what I view to be salient facts. First of all, the litigation went on for almost a year and a half. There were approximately a dozen depositions taken. There were at least three discovery motions. The plaintiffs were represented during that entire time by counsel, Kathy Heiberg. There were two motions for leave to amend their complaint, which were granted, and then a third motion for leave to amend, which was ultimately denied. The amount of judicial resources, to say nothing of the party's resources that was consumed by that first lawsuit, was enormous. The result of the first lawsuit was the entry of judgment against the plaintiffs by way of a motion for summary judgment. Summary judgment was granted against them. That became the final order in the case. The suggestion that their desire to dismiss their appeal from the first suit had somehow constituted the compromise of those claims is not borne out by the record. It's a simple stipulation of dismissal, pursuant to the Federal Rules of Appellate Procedure. I do not want to... They faced an $11,000 cost bill, which was waived in exchange for that. And please, Your Honors, if I go outside the record and it's inappropriate, I understand and I will immediately stop. But I want to assure each of you that there was no discussion whatsoever of a release or other arrangement which would somehow permit these plaintiffs to pursue the second suit in state court. That was never part of the discussion. And if you review the stipulation for dismissal and the actual dismissal for itself, it is impossible to draw that conclusion from it. It doesn't say anything to disturb, negate, void, clarify, or otherwise affect that final judgment that was entered below on the motion for summary judgment. The stipulation had the waiver of costs in it. It makes specific reference to the waiver of costs, yes, Your Honor. I'd like, with the Court's indulgence, to shift to the issue of subject matter jurisdiction first, if that's appropriate. Sure. I think the thing that's very easy to forget, or at least for me it's easy to recite in this area, is sort of the backdrop of ERISA preemption and just how broad it is. There is definitely a tendency, at least on my part, to get caught up in the particulars of a certain case. And I've always found it helpful to go back to the basic idea, what are we trying to achieve with ERISA, which is a uniform, preemptive federal policy that relates to certain types of benefit plans. Well, I know their complaint doesn't quite put it this way, but today they've raised the argument that there is, in fact, an ERISA claim by virtue of an amendment that was retroactively applied, at least as I understood the argument. Do you want to respond to that? I understand your preemption argument. We hear a lot of ERISA cases. I do not want to tire the Court with a fairly straightforward argument. I think what's happening here is the only issue of ERISA that's involved in this appeal, as opposed to the underlying case, is did the District Court have subject matter jurisdiction over the second lawsuit? It's not an issue of whether the District Court had subject matter jurisdiction over the second lawsuit. What the argument advanced this morning does is it really, it confuses the substantive requirements of ERISA with the issue of jurisdiction. Merely because the appellants feel, vehemently feel, that ERISA wasn't followed doesn't mean that it didn't apply. Our point is simple. Their claims all revolve around an attack on the adoption and establishment of this amended severance plan. There are a variety of different claims, but that's what they all come back to. There could be no clearer ERISA issue. Throughout their complaint, the best way I can say it is a reasonable person would look at the complaint and say this is a plea to nullify the amended severance plan. They come at it from a lot of different directions. They use several different facts, and they articulate a number of different formal causes of action. But what they all boil down to, their very essence, is a plea to the Court, nullify the amended plan, and let our case be evaluated with respect to what we call the original plan, the first plan. The first case then, in your view, was totally preempted as well. The first case was preempted as well, yes. The first case... That wasn't a holding, was it? No, because... That's the curious thing about it. Well, that was an argument that was never made. So, what's curious is why I didn't make it, and I will admit to that. But the first case was decided on the merits of the state law claims that were presented. And the first case was decided under diversity jurisdiction. Now, at one point, there was some skirmishing, that may be too strong a word, but there was a substantial disagreement of opinion on a jurisdictional issue. And the defendants did point out to the magistrate that regardless of whether there was subject matter jurisdiction under diversity, there was, in any event, federal question subject matter jurisdiction under ERISA. So, ERISA was mentioned as a jurisdictional base, but it was not argued as preempting or displacing the claims. And I don't want to go too far afield here, but I do think my judgment there was correct, because there were a couple of claims they had which did not relate to the severance benefit plan. In the first suit, they also wanted commissions and things like that. So, it was not as clearly focused on the ERISA issue. There was also, by Mr. Johnson, a straightforward claim under the Fair Employment and Housing Act for racial discrimination. In any event, the — Well, let's assume, though, for the sake of argument here, that what — and they haven't done that as yet, but it seems to me they're — if I'm interpreting what they were saying this morning, is that they're raising — now, they may raise pure ERISA issues. Those could not have been raised in the first case because they — it was not an ERISA case, right? So, therefore, res judicata might not apply. I guess that's what I'm — Well, actually, they could. Well, I would disagree, Your Honor. I think I understand the question and where you're headed now. I apologize if my first answer wasn't crossing swords with your inquiry. I see now what you're saying. The problem with that is you don't avoid res judicata simply by including a new theory. You know, Constance — No, the question is, could they have raised it? And that's, I mean, probably the central issue here. Right. That's where I was headed. They definitely could have raised it, even though it wasn't squarely posed in an ERISA envelope, so to speak, or in a form that was readily identifiable as ERISA. There's no doubt that the first lawsuit's about the very same set of events. There was this merger between Sterling Software and CA, this acquisition, I guess, which was consummated through the vehicle of the merger. And their claim in the first suit was that, hey, we were gooped out of our rightful severance benefits. We were told that the benefits under the Sterling Software plan would be applicable to us. We were encouraged to rely on those because we didn't really like the idea of working for that much larger company. So the issue was definitely positive. It wasn't as clearly articulated as a claim under a benefit plan because the vehicle they chose, for reasons that are unclear to me, was to say that the plan of merger required that result and that they were third-party beneficiaries to that contract. So there is no doubt that their ERISA claims are based on the very same facts that were alleged in the original lawsuit and clearly could have been alleged in the first lawsuit. And under the rule of Constantino and a tremendous number of this Court's opinions, anything which could have been included in the first suit and relates to the same transactional nucleus is part of the res judicata bar. Again, I don't want to I want to use our time productively, and I understand that the Court doesn't want to hear this argument. It is abundantly clear that that amended plan is an ERISA plan. I mean, the standard for an ERISA severance benefit plan is pretty simple. The Bogue v. Ampex case, which was conceded in an open and brief as being dispositive, says that where there is an administrative scheme that requires the administrator to analyze the circumstances of each employee's termination in light of the criteria, that's enough. And in Bogue, it's basically our same case. There was a merger. The plan provided benefits if the acquirer didn't offer substantially equivalent employment. So that's almost a term of art for ERISA severance benefit plans. This amended plan has almost exactly the same issue. The administrator looks at three things that are pertinent for today's discussion. Was the employee terminated for good reason? You know, some kind of good cause for being subordinate, et cetera. Did they refuse a job of similar salary? In other words, substantially equivalent employment. And was their job eliminated because of the acquisition? So there's no doubt we have an ERISA severance benefit plan that is being contested here. And that provided the subject matter of jurisdiction for the district court to enter its order in the second case, its order of judgment on the pleadings dismissing because of race, gender, and status. Obviously, both suits arise from the same events. You know, the acquisition, substitution of the plan, their subsequent termination accompanied by severance offers from the amended plan instead of the original plan. They have the exact same nucleus. You know, this device of alleging a different claim, taking a tort claim and finding a statutory basis for it, that has consistently been rejected as a way to avoid the race judicata bar. And I really think at the end of the day, that's the long and short of our argument. Our lawyers who took over the second suit managed to find different ways to say the same thing. Therefore, race judicata doesn't apply, and that's not the law. We discussed the fact that there was a reason for that judgment or create some kind of different arrangement or release. I do think there's an aspect of the briefing by the appellants that really states the problem far more eloquently than I have today or ever could. They claimed that there was new evidence involved. And this second lawsuit is really about the new evidence. And there's no way that new evidence could have been presented in the first lawsuit. The problem with that argument is they took that new evidence and these new theories and they presented them to the court and said to the district court, please, let us amend our complaint again for a third time. The court said, no, enough. The motion for summary judgment was decided soon thereafter. Final judgment was entered against these individuals. They were still represented by counsel. They knew that they had the right to take an appeal. Indeed, they took the first step. They filed a notice of appeal. And then they dismissed it. But what they really attack, at the core of their arguments, what they're really saying is the district court erred when it didn't allow us to amend that complaint. That's the essence of their issue with the ruling below. Their opportunity to correct that was to come to this court and appeal that original order. They chose to forgo that. I'd also like to make one procedural point, and I do think it's pertinent because they were this argument that somehow the dismissal turned into a release, which magically cleaved the situation in two, was never presented below. It was not even presented in their opening brief. The first time it surfaced was their reply brief. And I believe under longstanding Ninth Circuit law, that argument actually is waived or at least typically the court wouldn't consider it. Thank you. Thank you, counsel. Thank you very much. Mugavitri, you have two minutes. One thing I find amazing about his argument, about complaining about the amount of time it took place, he's been fighting a war of attrition, doing a very good job at it. And the evidence that we finally got in late spring of 2002, that's evidence that we should have gotten much sooner. There were numerous games with the provision of evidence to us. And I don't think you can allow that type of behavior. The other thing is, I would take just about anything Mr. Child says about the settlement discussion with a grain of salt. In his opening brief, he denied that he even knew about the second case. And I've attached a letter to my reply brief that shows that, indeed, he fairly, he did know about it. Well, what about the terms of it? His argument is you did not preserve the issues. You simply waived the appeal and you got the benefit of $11,000 in costs not being paid. But we never would have approved of a dismissal that would have not preserved our rights in the second case. Well, did you reserve them? I mean, if you signed them and you've got a lawyer working for you, apparently sign them away. The case law that I cited says if we didn't sign them away as part of that dismissal, then, you know, if it wasn't written in that dismissal, we didn't sign them away. Even though you're dismissing the entire appeal? On the first suit. Yes. You're dismissing the entire appeal and you somehow have reserved some issues? That's correct. And you say you cited cases? Here's another example of where that would happen. Okay? Say we're going through a lawsuit and as we weed out before we go to the court, we dismiss some of the claims without prejudice. That's fine. And then we get a ruling against us. And then later on, we could actually litigate the claims that were split or dismissed without prejudice. Another thing I would look at about the whole ERISA argument is, you know, winter route, it is right on point here. I mean, these people haven't done anything to advise us of our ERISA rights. You know, the way ERISA is written, the guy who pushes the broom in the hallway at night who maybe has a third grade education or high school education, he has a right to see the documents. He has a right to know what he has to do in order to receive the benefits. They've done absolutely no ERISA behavior. And all they're doing is they're using ERISA as a way to shield themselves from being prosecuted for fraud. And, you know, he's trying to claim that we were, the first case was about being duped out of severance. No, any of the claims about severance in the first case were merely that we had this third-party beneficiary contract that promised us severance, and they just simply withheld the benefits that were in the contract. Thank you. Mr. Johnson, you get the last word today. I will say that, yes, we did reserve our rights. It was our intent to. We attempted to, and it was our understanding that that's what was accomplished with our attorneys at the time. Well, we have to read what you actually signed off on, not what you had in your mind. And when you say we signed off on, you're talking about us. Well, it was your lawyer. Right. So I know what we approved. I know the conversations that occurred. I know the settlement offers that were made. And I know that for whatever the reason, our counsel allowed CA to draft the stipulated agreement. Well, it may well be that she believed that she was preserving rights, and they may well believe that you weren't. And we just have to see where the chips fall on that. But that's what we have to look at. You understand that? Yeah. The written document. Right. Not something else. And, actually, it's a key point. It's a procedural issue. And we may have violated it. I hate to say that, but it certainly wasn't my intent in doing so. Oh, Brad would like me to, in my two minutes, to state that the Kelly versus Merrill Lynch is, I guess, with reference to the restatement for the second of judgments, is also applicable. As far as the settlement can limit the scope of the preclusive effect of a dismissal with prejudice by its terms. I think you may be right. The question is whether you did it. Yeah, that's something we'll just have to assess from the document. But we take your point. We paid $11,000 in exchange for a million-dollar lawsuit when we had already filed a second lawsuit, and we're proceeding with it, and had indicated that we were proceeding with it. It just doesn't sync up. And I understand what counsel has said, but I do think it's in light of what Brad said, it should be taken with a grain of salt as well. That's the best I can do as far as accounting for what was actually done by the attorneys. I guess one final point here is, in the first appeal, if we had kept it and pursued it, yes, there would have been a lot of things that would have been pursued, including an argument that we were not allowed to fulfill, that the defendants did not fulfill the discovery requirements, and it created a problem on our side, which allowed us to attempt to try to go around that by saying we haven't gotten all the information that we requested, but the judge refused to allow us to do so. That was the point where we felt we had a right to go back in at the appellate level and say, among other things, here's the reason why we should be allowed to continue this case, because we really haven't gotten the information. For example, computer files that they claimed were not available. We had been asking why the amended document was valid, and that was never explained to us at any level at any time. Deborah Coughlin, I put in numerous calls, emails, faxes, letters to Deborah Coughlin to try to get an understanding of what my rights were. I never got one response from her, and yet she's the person that signed the amendment, was designated as a plan administrator in their amended document, but we were never allowed to be heard. And there is a case law that references the fact that our rights would not be dismissed based on the fact that we were never given a clear explanation and a clear understanding. Thank you. The case has heard will be submitted. We want to thank both of you for preparing, sorry, for the initial confusion on the time allocation. That was my problem. I should have been clearer in the order.
judges: Canby, Noonan, Thomas